ST. PAUL, M. & M. RY. CO. et al. v. ST. PAUL & N. P. R. CO.

ST. PAUL & N. P. R. CO. v. ST. PAUL, M. & M. RY. CO. et al.

(Circuit Court of Appeals, Eighth Circuit. May 6, 1895.)

Nos. 455 and 456.

**1. FEDERAL COURTS—JURISDICTION—FEDERAL QUESTION.**

If it appears from the plaintiff's complaint that, in any aspect which the case may assume, the right of recovery may depend upon the construction of federal statutes, and if the right of recovery, so far as it turns upon the construction of such statutes, is not merely a colorable claim, but rests on a reasonable foundation, a federal question is involved which is adequate to confer jurisdiction, although the right of recovery is also predicated on other grounds, not involving federal questions, and although the case is ultimately decided upon grounds not involving the determination of any federal question.

**2. SAME—CLAIM MERELY COLORABLE.**

A case which, in fact, depends for its decision upon questions of local or general law, cannot be brought within the jurisdiction of the federal courts by a reference in the complaint to a federal statute, and by setting up a merely colorable claim thereunder, nor because it may be found necessary to consult some federal statute to ascertain the meaning of a contract or the scope and effect of a local law.

**3. SAME—TITLE DERIVED FROM UNITED STATES.**

The federal courts do not acquire jurisdiction of a controversy in respect to the title to lands because the title was derived originally from the United States unless the controversy involves the construction, meaning, or effect of the granting acts.

**4. STATUTES—CONSTRUCTION—FORFEITURE OF LAND GRANT.**

The state of Minnesota conferred upon the S. & P. Ry. Co. the interest of the state in a large quantity of land granted to the state by congress, in aid of the construction of a railroad, by certain acts which provided that the title to the lands should only be acquired as the road adjacent to the particular lands was completed. By subsequent proceedings, the S. & P. Co. was practically divided into two corporations, the second known as the F. D. Co. The F. D. Co. constructed a large part of the road, and the governor of the state, acting in his official capacity and upon the supposition that such lands had been duly earned by the F. D. Co., conveyed large quantities of land to it, including some land beyond the furthest point to which the road was built. The deeds were duly recorded at the

times when they were made, in 1866 and 1871, and the F. D. Co. sold and conveyed large amounts of the lands covered by them. The S. & P. Ry. Co. having failed to construct a part of the line, the legislature of Minnesota, on March 1, 1877, passed an act to provide for its completion, forfeiting the grants previously held by the S. & P. Co. appertaining to the uncompleted portion of the line, and authorizing any corporation organized to build a railroad in the state to acquire the right to complete the line, and, upon so doing, and complying with the act, to be invested with the rights, lands, and property appertaining to the portion of the road it should complete, and formerly held by or belonging to the S. & P. Ry. Co. This act contained provisions for reserving part of the lands by the state, to pay claims for labor and materials used in completing the road, and excluding any corporation which should take advantage of it from acquiring title to any land in the grant upon which any settlement had been made or pre-emption claim filed. It did not appear that, at the time of the passage of this act, the validity of the deeds executed by the governor in 1866 and 1871 had ever been questioned. The complainant corporation complied with the provisions of the act, and completed the road, including the part beyond the point at which the F. D. Co. stopped. *Held*, that it was not the intention of the legislature, by the act of 1877, to, forfeit the lands conveyed by the deeds of the governor, or to declare such deeds void, and that the complainant corporation acquired no rights in the lands conveyed by such deeds to enable it to question the title of those who held under them.

Appeals from the Circuit Court of the United States for the District of Minnesota.

This was a bill which was filed by the St. Paul & Northern Pacific Railroad Company, hereafter termed the plaintiff company, against the St. Paul, Minneapolis & Manitoba Railway Company et al., to establish its title to a large body of land in the state of Minnesota, and to annul certain deeds which were executed by the governor of that state in the years 1866 and 1871, on the ground that they operated as a cloud on the plaintiff company's title. The plaintiff also prayed that the defendant company might be required to account for and to pay over to it all such sums as it had realized from sales made of any of the lands embraced in the aforesaid deeds. The lands in controversy are a part of the lands granted by the United States, on March 3, 1857, to the then territory of Minnesota, to aid in the construction of a main line of railroad from Stillwater, on the eastern boundary of the territory, via St. Paul and St. Anthony, to a point on the western boundary of the territory between the foot of Big Stone lake and the mouth of the Sioux Wood river, afterwards fixed at Breckenridge, with a branch from St. Anthony, via Anoka, St. Cloud, and Crow Wing, to St. Vincent, in the northwestern portion of the territory.

A general statement of the facts out of which the controversy arises is as follows: Both parties derive title to the lands in dispute under the aforesaid grant of March 3, 1857 (11 Stat. 195, c. 99). That act granted to the territory of Minnesota, in aid of building the aforesaid main and branch lines of railroad, "every alternate section of land, designated by odd numbers, for six sections in width on each side of each of said roads and branches," with the right to select land, in alternate sections or parts of sections, lying within 15 miles of said main and branch lines, to make up for any deficiency in the grant caused by sales of land or by the filing of pre-emption claims before the definite location of the road. The act further provided "that the lands hereby granted for and on account of said roads and branches, severally, shall be exclusively applied in the construction of that road for and on account of which such lands are hereby granted, and shall be disposed of only as the work progresses; * * * that the said lands hereby granted to the said territory or future state shall be subject to the future disposal of the legislature thereof for the purposes herein expressed and no other;" and that they should be disposed of "by said territory or future state only in the manner following, that is to say: that a quantity of land not exceeding one hundred and twenty sections for each of said roads and branches, and included within a continu-

ous length of twenty miles of each of said roads and branches, may be sold; and when the governor of said territory or future state shall certify to the secretary of the interior that any twenty continuous miles of any of said roads or branches is completed, then another quantity of land hereby granted, not to exceed one hundred and twenty sections for each of said roads and branches having twenty continuous miles completed as aforesaid, and included within a continuous length of twenty miles of each of such roads or branches, may be sold; and so from time to time until said roads and branches are completed. * * *" By an act of congress approved March 3, 1865 (13 Stat. 526, c. 105), the aforesaid grant was increased to 10 sections per mile, and the indemnity limits were extended to 20 miles from said lines of road. As to the mode of disposing of the land, the act of March 3, 1865, provided as follows: "When the governor of said state shall certify to the secretary of the interior that any section of ten consecutive miles of said road is completed in a good, substantial, and workmanlike manner, as a first-class railroad, and the said secretary shall be satisfied that said state has complied in good faith with this requirement, the said secretary of the interior shall issue to the said state patents for all the lands granted and selected as aforesaid, not exceeding ten sections per mile, situated opposite to and within a limit of twenty miles of the line of said section of road thus completed, extending along the whole length of said completed section of ten miles of road, and no further. And when the governor of said state shall certify to the secretary of the interior, and the secretary shall be satisfied that another section of said road, ten consecutive miles in extent, connecting with the preceding section or with some other first-class railroad, which may be at the time in successful operation, is completed as aforesaid, the said secretary of the interior shall issue to the said state patents for all the lands granted and situated opposite to and within the limit of twenty miles of the line of said completed section of road or roads, and extending the length of said section, and no further, not exceeding ten sections of land per mile for all that part of said road thus completed under the provisions of this act and the act to which this is an amendment, and so, from time to time, until said roads and branches are completed. And when the governor of said state shall so certify, and the secretary of the interior shall be satisfied that the whole of any one of said roads and branches is completed in a good, substantial, and workmanlike manner, as a first-class railroad, the said secretary of the interior shall issue to the said state patents to all the remaining lands granted for and on account of said completed road and branches in this act, situated within the said limits of twenty miles from the line thereof, throughout the entire length of said road and branches. * * *" An act of congress approved July 13, 1866 (14 Stat. 97, c. 183), relative to the aforesaid grant, provided "that all the lands heretofore granted to the territory and state of Minnesota to aid in the construction of railroads, shall be certified to said state by the secretary of the interior, from time to time, whenever any of said roads shall be definitely located, and shall be disposed of by said state in the manner and upon the conditions provided in the particular act granting the same, as modified by the provisions of this act; * * * that the lands granted by any act of congress to the state of Minnesota, to aid in the construction of railroads in said state, specifically, lying in place, on any division of ten miles of road, shall not be disposed of until the road shall be completed through and coterminous with the same; provided, however, that this provision shall not extend to any lands authorized to be taken to make up deficiencies."

Turning to state legislation with reference to the aforesaid grant, and to other acts done which affect the questions at issue, the following may be mentioned as the most material: The grant made by the act of March 3, 1857, supra, was conferred by the territorial legislature on the Minnesota & Pacific Railroad Company, which had been incorporated to construct the main and branch lines of railroad aforesaid, but, that company having failed to discharge its obligations, the grant became revested in the state of Minnesota on June 23, 1860, by proper proceedings taken that are not challenged. The state thereafter, on March 10, 1862, incorporated the St. Paul & Pacific Railroad Company to construct said uncompleted lines of road, and, for the purpose of aiding it in so doing, conferred upon it "all the interest of the state,

present and prospective, in and to any and all the lands granted by congress to the territory of Minnesota," by the act of March 3, 1857, for the purpose of aiding in the construction of said lines of road, "together with all and singular the rights, privileges and immunities conferred and intended to be conferred by said act of congress." The act last aforesaid, creating the St. Paul & Pacific Railroad Company, and conferring upon it the rights and privileges aforesaid, contained the following provision as to the conveyance of said lands by the state: "Whenever said company shall actually complete that portion of the road between St. Paul and St. Anthony, so that regular trains of cars are running thereon, and not before, the governor shall certify the same to the secretary of the interior, and thereupon the title to one hundred and twenty sections of land shall vest in said company. And when twenty continuous miles of said road shall be completed, and regular trains running thereon, the title to a further quantity of one hundred and twenty sections of land shall vest in said company. And whenever said company shall actually complete twenty continuous miles of said road from Minneapolis westwardly, so as to admit of the running of regular trains of cars on the same, the governor shall certify the same to the secretary of the interior, and thereupon a further quantity of one hundred and twenty sections of said lands shall vest in said company; and so on, as often as any further twenty continuous miles of said road shall be completed so as to admit of the regular running of trains of cars thereon, the governor shall in like manner certify the same to the secretary of the interior, and a further quantity of one hundred and twenty sections of said land shall vest in said company; and it shall be the duty of the governor, whenever said road shall be completed between St. Paul and St. Anthony, in his official capacity, and on behalf of the state, to convey to said company one hundred and twenty sections of land; and whenever any further twenty continuous miles of said road or its branches shall be completed and in operation, the governor shall in like manner convey a further quantity of one hundred and twenty sections of land and so on as often as any further twenty continuous miles of said road or its branches shall be completed, shall in like manner convey to said company a further quantity of one hundred and twenty sections of land, until there shall be conveyed to said company all the lands to which they shall be entitled, according to the terms and provisions aforesaid. * * *" Sp. Laws Minn. 1862, c. 20. Prior to the passage of the last-mentioned act of March 10, 1862, the United States had certified to the state of Minnesota about 370,394 acres of land which pertained to the branch line aforesaid from St. Anthony, via St. Cloud and Crow Wing, to St. Vincent. On February 6, 1864, one E. B. Litchfield entered into an agreement with the St. Paul & Pacific Railroad Company to construct the main line of its road from St. Anthony to Breckenridge, and its branch line from St. Paul to Watab in Benton county, Minn., a place 80 miles northwest from St. Paul, and, in consideration therefor, the St. Paul & Pacific Railroad Company by said agreement sold, assigned, and transferred to Litchfield all of its "rights, benefits, privileges, property, franchises, and interests * * * under the laws of the territory or state of Minnesota" belonging to that portion of the branch line from St. Paul to Watab, "together with the lands granted by congress to the territory of Minnesota for the purpose of aiding in the construction of said eighty miles of road." It also sold and transferred to Litchfield, by the same agreement, all of its rights, franchises, etc., belonging to the main line from St. Anthony to Breckenridge, together with the land granted by congress for the purpose of aiding in the construction of that part of the main line. The agreement with Litchfield was subsequently fully ratified and confirmed by the state of Minnesota by legislative enactment, and Litchfield and his associates became consolidated into a corporation under the name of the First Division of the St. Paul & Pacific Railroad Company. Sp. Laws Minn. 1866, c. 1. The latter company will be hereafter termed the First Division Company. In this manner the St. Paul & Pacific Railroad Company became segregated into two corporations.

One day before the grant of March 3, 1857, was enlarged, as heretofore stated, that is to say, on March 2, 1865, the legislature of Minnesota passed an act which contained the following provision, to wit:

"Sec. 2. Any and all additional grants of land made prior to the passage of this act, or which may hereafter be made by the congress of the United States,

to the state of Minnesota for the purpose of aiding in the construction of the lines of railroad or any portion of them authorized to be constructed by the St. Paul and Pacific Railroad Company, shall inure to the benefit of said company, and said lands and the present and future interest of the state in or to them, are hereby granted and assigned unto the said company upon the same terms and conditions as the lands heretofore granted for the same purpose, together with the conditions contained in said act of congress donating the same. And the title of all lands heretofore, or hereafter granted by the congress of the United States, to the state of Minnesota for the purposes aforesaid, shall vest in said company at the time, and upon the terms prescribed by said act or acts of congress making the grant, and it shall be the duty of the governor, on behalf of the state, to convey to said company the lands so granted according to the terms and provisions contained in the act or acts aforesaid." Sp. Laws Minn. 1865, c. 6.

The so-called branch line from St. Paul to Watab was completed in sections, as follows: Ten miles of the road, from St. Paul to St. Anthony, were completed on or about July 2, 1862, prior to the organization of the First Division Company; by February 20, 1865, a further section of 10 miles, from St. Anthony in the direction of Watab, was completed; before March 3, 1865, when the grant was enlarged, an additional section of 20 miles was completed, making 40 miles of completed road counting from St. Paul, or 30 miles counting from St. Anthony; prior to September 18, 1866, a further section of 30 miles was completed to St. Cloud; some time in the fall of 1867, the branch line was extended by the First Division Company from St. Cloud to Sauk Rapids, the latter point being 76 $3/_{10}$ miles distant from St. Paul, and about four miles from Watab; the First Division Company never constructed the remaining 4 miles necessary to reach Watab. The governor of the state of Minnesota made several conveyances to the First Division Company of lands pertaining to the branch-line land grant, on the assumption that the lands had been duly earned by the First Division Company under the legislative acts aforesaid, by the construction of the branch line to the extent last above indicated. Only three of the deeds so made are challenged in the present suit. The first of said three deeds was executed on August 22, 1866. It purported to convey 76,422.07 acres of land, about 11,540 acres whereof were situated north of Watab. The deed contained a recital that the governor had, on August 21, 1866, certified to the completion of a second section of 20 miles of the branch line, and that the First Division Company had become entitled to a deed for an additional 120 sections of land to aid in the construction of a third section of 20 miles of the branch line, which were thereby conveyed. The second deed was executed on September 20, 1866, and purported to convey 76,624.86 acres of land, about 58,721 acres whereof were north of Watab. This deed contained a recital that the governor had certified to the completion of a third section of 20 miles of the branch line, and that the grantee had become entitled to a conveyance of an additional 120 sections of land to aid in the construction of the fourth and last section of 20 miles of the branch line. The third deed was not executed until July 26, 1871. It purported to convey 77,008.86 acres of land, about 47,741 acres whereof were north of Watab. It contained a recital, in substance, that the land conveyed was land to which the First Division Company had become entitled under the various statutes heretofore mentioned, in consequence of the increase of the original grant from 6 to 10 sections per mile. The plaintiff company contended that, upon a true construction of the aforesaid federal and state statutes, the three deeds last above mentioned were executed without authority of law, and were utterly void as to the lands conveyed lying north of Watab. By an act of congress approved March 3, 1871 (16 Stat. 588, c. 144), the St. Paul & Pacific Railroad Company was authorized to change the course of the branch line beyond St. Cloud, by constructing it on a more direct route from St. Cloud to St. Vincent, without passing through Crow Wing, but this change of route was authorized on condition that it built a road about due north from St. Cloud, via Crow Wing, to Brainerd, Minn., to connect at that point with the Northern Pacific Railroad. The same act gave the same proportional grant of lands along the new route from St. Cloud to St. Vincent, on condition that the St. Paul & Pacific Railroad Company relinquished the old grant along the line as originally projected, from Crow Wing to St. Vincent.

The plaintiff company lays claim to all the lands north of the Watab terminal, about 118,000 acres, that were conveyed by the governor to the First Division Company by the three deeds aforesaid, on the following grounds, that is to say: The St. Paul & Pacific Railroad Company having failed to construct the line of road from St. Cloud to Brainerd, and from St. Cloud to St. Vincent on the new route, as authorized by the act of March 3, 1871, supra, the legislature of Minnesota, on March 1, 1877, passed an act entitled "An act to provide for the completion of the lines of railroad commonly known as the St. Paul and the Pacific Extension Lines."

The first section of that act was as follows: "Be it enacted etc., * * * That the rights, privileges, franchises, grants of land, and property heretofore held by the St. Paul and Pacific Railroad Company, appertaining to the uncompleted portions of that line of railroad extending from Watab to Brainerd, are hereby declared forfeited to the state, without merger or extinguishment, but are hereby preserved, continued and conferred upon the terms and conditions as in this act provided."

The second, third, and fourth sections of the act authorized persons holding bonds secured by mortgage on said extension lines to organize a "bond company" to complete the same, but such corporation was not organized, and these sections never became operative.

The fifth section of the act contained the following provision: "In case such a corporation as that herein designated the 'bond company,' shall not be duly and sufficiently organized for the purposes of this act, on or before May 1, 1877, * * * then, and in that case, any company or corporation now organized, or that may hereafter organize, having authority from this state to build, maintain and operate a line of railroad within or through the state, may succeed to and acquire the right to complete, own, maintain and operate the uncompleted portions of said line of railroad mentioned in the first section of this act, by filing with the governor a written notice of its desire and intention, under and subject to the provisions of this act, to complete, equip, maintain and operate the then uncompleted portions of said line of railroad. * * * Work shall be commenced thereon within thirty days after the filing of such notice, or as soon thereafter as the state of weather shall permit, and prosecuted to completion within one year from the filing of such notice. * * * But upon default to commence work or to prosecute the same to completion within the time aforesaid, said company shall forfeit all right to complete, maintain or operate the part or portion of said line remaining uncompleted at the time of such default. * * *"

The seventh, ninth, and tenth sections of the act contained the following provisions:

"Sec. 7. * * * Any company acting under and pursuant to the provisions of this act, shall become entitled to, and invested with, all and singular the rights, privileges, immunities, franchises, lands and property appertaining to the portion of road it shall complete, which were formerly held by, or which formerly belonged to, the St. Paul and Pacific Railroad Company, or which were formerly granted to the St. Paul and Pacific Railroad Company, and shall be entitled to the same whenever and as often as any continuous ten (10) miles of road are completed. * * *"

"Sec. 9. One half of all the land up to two hundred thousand acres in quantity, which shall be first acquired on account of the construction of the present uncompleted line of railroad from Watab to Brainerd, * * * shall be reserved and retained by the state, to be used by it for the payment of the claims incurred for work and material furnished in the construction of said lines of railroad. * * *"

A board was also created by this section to audit and allow such claims and to sell the reserved lands for the purpose of paying the same after they had been allowed.

"Sec. 10. The St. Paul and Pacific Railroad Company, or any company or corporation taking the benefits of this act, shall not in any manner, directly or indirectly, acquire or become seized of any right, title, interest, claim or demand in or to any piece or parcel of land lying and being within the granted or indemnity limits of said branch lines of road, to which legal and full title has not been perfected in said St. Paul and Pacific Railroad Company, or their successors or assigns, upon which any person or persons have in good

faith settled and made or acquired valuable improvements thereon, on or before the passage of this act, or upon any of said lands upon which has been filed any valid pre-emption or homestead filing or entry, not to exceed one hundred and sixty acres to any one actual settler; and the governor of this state shall deed and relinquish to the United States all pieces or parcels of said lands so settled upon by any and all actual settlers as aforesaid, to the end that all such actual settlers may acquire title to the land upon which they actually reside, from the United States, as homesteads or otherwise, and upon the acceptance of the provisions of this act by said company, it shall be deemed by the governor of this state as a relinquishment by said company of all such lands so occupied by such actual settlers; and in deeding to the United States such lands, the governor shall receive as prima facie evidence of actual settlement on said lands, the testimony and evidence, or copies thereof, heretofore, or which may be hereafter taken in cases before the local United States land offices, and decided in favor of such settlers."

Sp. Laws Minn. 1877, p. 257, c. 201.

It is conceded that the Western Pacific Railroad Company, now known as the St. Paul & Northern Pacific Railroad Company (the plaintiff company), complied with the provisions of the foregoing act of March 1, 1877; that it completed the road from Watab to Brainerd about November 1, 1877, and thereby became entitled to all the property, lands, and franchises that were intended to be conferred by said act.

The defendant company, the St. Paul, Minneapolis & Manitoba Railway Company, deraigned title to the lands in controversy by foreclosure sales made under the following described mortgages: First, by a sale under a mortgage executed June 2, 1862, by the St. Paul & Pacific Railroad Company for the purpose of securing bonds, which mortgage covered the so-termed branch line from St. Paul to Watab, and purported to convey all the right, title, and interest the said company then had or might become entitled to of, in, or to the lands granted to the territory of Minnesota by the act of March 3, 1857, "for the purpose of aiding * * * in the construction of a railroad from St. Paul, via St. Anthony, Anoka and St. Cloud, to Watab on the Mississippi river, being three thousand eight hundred and forty acres of land for each mile, amounting in the aggregate to three hundred and seven thousand, two hundred acres, be the same more or less, and situated in the present state of Minnesota adjoining and adjacent to the line of the railroad" of the St. Paul & Pacific Railroad Company, "hereinbefore described." Second, by a sale under a mortgage executed by the First Division Company October 1, 1885, to secure certain bonds, which mortgage purported to convey all the right, title, and interest which the First Division Company then had or might become entitled to of, in, or to all of those sections of land granted to the territory and state of Minnesota by the acts of March 3, 1857, and March 3, 1865, to aid in the construction of the railroad lines mentioned in said acts, and which lands were subsequently granted by the state to aid in the construction of the branch line from St. Paul, via St. Anthony, Anoka, and St. Cloud, to Watab. The land so conveyed was further described in said mortgage as consisting of 10 sections per mile, amounting in the aggregate to 512,000 acres, and as being "situate in the present state of Minnesota adjoining and adjacent to the line of railroad" of said First Division Company, "as hereinbefore described." Third, by a sale under another mortgage, executed April 1, 1871, by the St. Paul & Pacific Railroad Company, covering the new or altered line, and land grant pertaining thereto, from St. Cloud to St. Vincent, which had been authorized by the act of March 3, 1871, supra; also covering the line required to be built by that act from St. Cloud, via Crow Wing, to Brainerd. The St. Paul & Pacific Railroad Company was made a party to each of the suits whereby the aforesaid mortgages were foreclosed. By virtue of sales made under the decrees of foreclosure in said suits, the defendant company claims to have succeeded to all the right, title, and interest of the First Division Company in and to the lands now in controversy which the latter company acquired through the legislation aforesaid, and by the agreement between Litchfield and the St. Paul & Pacific Railroad Company, heretofore mentioned. On March 7, 1881, the state of Minnesota, by legislative enactment, "fully ratified and confirmed" the several purchases so made as aforesaid by the defendant company of the lines of road heretofore described,

and the rights and franchises pertaining thereto.  Sp. Laws Minn. 1881, c. 412.

The original bill of complaint in the present action was filed on August 18, 1886.  An amended complaint was filed five years thereafter, to wit, on August 31, 1891.  The original bill prayed that the defendant company might be decreed to hold the lands in controversy, that is, the lands north of Watab, as a trustee for the plaintiff company, and that it be required to convey the same to the plaintiff by a good and sufficient deed; also, that it be required to account for the proceeds of all the lands in controversy that it had sold. The amended bill prayed for a cancellation of the aforesaid deeds executed by the governor of the state of Minnesota, as clouds upon the complainant's title, and that the defendant company might be compelled to account for the proceeds of such of said lands embraced in said deeds as it had sold and conveyed to third parties.  The circuit court found and decided that the deeds executed by the governor of the state of Minnesota on August 22, 1866, September 20, 1866, and July 26, 1871, hereinbefore mentioned, were null and void so far as they conveyed lands north of Watab, and that they operated as a cloud upon the plaintiff company's title.  57 Fed. 272.  It accordingly decreed that said deeds be canceled so far as they operated to cloud the plaintiff company's title, and that the defendant company pay to the plaintiff $270,-844.05, the same being the amount found to have been received by the defendant company on account of lands sold.  Both parties have perfected an appeal to this court, and both appeals are before us on the same record.

M. D. Grover and George B. Young (T. R. Benton, on the brief), for St. Paul, M. & M. Ry. Co.

Fred M. Dudley and James McNaught, for St. Paul & N. P. R. Co.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The first question presented for consideration is one of jurisdiction, and, as both parties to the suit are corporations created by and existing under the laws of the state of Minnesota, the decision of the jurisdictional question turns upon the inquiry whether the case is one arising under the laws of the United States.  Since the recent decisions in Tennessee v. Union & Planters' Bank, 152 U. S. 454, 14 Sup. Ct. 654; Chappell v. Waterworth, 155 U. S. 102, 15 Sup. Ct. 34; and Postal Telegraph Cable Co. v. Alabama, 155 U. S. 482, 15 Sup. Ct. 194,—it must be regarded as settled that the circuit court of the United States cannot entertain jurisdiction of a case as one arising under the constitution, laws, or treaties of the United States, whether such suit is commenced therein originally, or is brought thereby removal, unless the plaintiff's complaint or declaration shows that it is a case arising under the federal constitution or national laws or treaties.  And even under the judiciary act of March 3, 1875 (18 Stat. 470, c. 137), the same rule, it seems, was applicable to suits originally brought in the circuit court; that is to say, under that act the right to entertain a case brought therein originally, on the ground that it involved a federal question, depended upon the inquiry whether the plaintiff's statement of his cause of action showed the existence of a federal question.  Tennessee v. Union Planters' Bank, supra; Metcalf v. Watertown, 128 U. S. 586, 589, 9 Sup. Ct. 173.  The necessary result of this doctrine is that, when a complaint filed in the circuit court of the United States discloses a controversy arising under federal laws, the jurisdiction of the court will not be

defeated by any defense or plea that the defendant may see fit to make. If the plaintiff's right to sue in the national courts is to be tested solely by his complaint or declaration, and is not aided by any plea interposed by the defendant, no matter how clearly the latter may show that the construction or application of federal laws is involved, then it follows that, if jurisdiction is fairly disclosed by the plaintiff's statement of his own cause of action, it cannot be defeated by an answer or plea so conceived and drawn as to avoid the consideration of any federal question or questions. In other words, as was said, in substance, in Osborn v. Bank, 9 Wheat. 738, 824, the right of the plaintiff to sue does not depend upon the defense which the defendant may choose to set up, because the right to sue exists, if at all, before any defense is made, and must be judged exclusively as of the date of the filing of the complaint, on the state of facts therein disclosed. If, on the face of the complaint or declaration, the case is one which the court has the power to hear and determine, because of the existence of a federal question, it has the right to decide every issue that may subsequently be raised, and whether the decision of the case ultimately turns on a question of federal, local, or general law is a matter that in no wise affects the jurisdiction of the court. Mayor v. Cooper, 6 Wall. 247; Railroad Co. v. Mississippi, 102 U. S. 135, 141; Tennessee v. Davis, 100 U. S. 257, 264; Omaha Horse Railway Co. v. Cable Tramway Co., 32 Fed. 727.

In the light of these principles, we proceed to inquire whether any question of a federal character is presented by the bill of complaint which it may become necessary to decide in disposing of the issues involved in the present controversy. In the consideration of this question we do not deem it essential to state in detail all of the allegations of the amended bill, on which the case appears to have been tried and decided. It will suffice to say in this behalf that the amended complaint set forth by appropriate allegations all of the legislation, both state and national, affecting the land grant in question, and all of the facts and circumstances pertaining thereto, which we have already recited at length in the foregoing statement. In addition to such averments, the amended bill also alleged, in substance, that the lands now in controversy, being those situated north of Watab, were conveyed by the governor of the state of Minnesota to the First Division Company before the line of road along which they specifically lay in place was completed through and coterminous therewith; that the road abreast of which the disputed lands lie was constructed by the plaintiff company, and not by the First Division Company; that no part of said lands ever belonged or pertained to that part of the branch line which was constructed by the First Division Company, and that, in executing the deeds for the lands in controversy to the First Division Company, the governor of the state acted "wrongfully and without authority of law," and that the deeds so executed were "contrary to law, and void." The bill further averred that the plaintiff company was the owner of, and that it laid claim to, all the lands in dispute; that the defendant company had no interest therein or right thereto; and it contained a prayer that the plaintiff company be decreed to be the

owner of said lands, and that the deeds executed by the governor be adjudged to be null and void, and that the same be canceled as a cloud upon its title. In all of its essential features, therefore, the case made by the amended complaint was a suit to remove a cloud and to quiet title. It does not follow, however, that the case at bar is one of federal cognizance because it contains a reference to numerous acts of congress, and lengthy extracts therefrom. A case which in fact depends for its decision upon questions of local or general law cannot be brought within the jurisdiction of a federal tribunal as one arising under the constitution and laws of the United States merely by a reference in the complaint or declaration to some federal statute or statutes, and by setting up a claim thereunder which is merely colorable, and obviously without any reasonable foundation. If such a practice was tolerated, the result would be that the jurisdiction of the federal courts would be unduly enlarged, and made to comprehend a class of cases which were never intended to be tried therein. New Orleans v. New Orleans Water Works, 142 U. S. 79, 12 Sup. Ct. 142; Hamblin v. Land Co., 147 U. S. 532, 13 Sup. Ct. 353; St. Louis, etc., Ry. Co. v. State of Missouri, 15 Sup. Ct. 443.

At this point it accordingly becomes necessary to examine the various grounds upon which the plaintiff company predicates its right to recover. It is obvious that it derives its right to sue solely from the act passed by the legislature of the state of Minnesota on March 1, 1877, the material provisions of which act have been embodied in the foregoing statement. In the absence of that enactment, the plaintiff company would have no standing in any court, state or federal, to challenge the defendant's title to the lands in controversy, whether the deeds conveying the same are valid or invalid, void or voidable. The first question, then, that is encountered in the case is whether, by the act last aforesaid, the legislature of the state intended to transfer the lands north of Watab, which had theretofore been deeded by the governor of the state to the First Division Company, to such other railroad company as might construct the uncompleted line of road from Watab to Brainerd, and whether, if it did so intend, the language of the act was adequate to vest in such company as elected to complete the road a legal title to such lands north of Watab and within the limits of the grant as the state then had power to convey. With respect to this question, a controversy arises between the two companies. It is the primary issue in the case. And it must be conceded, we think, that this controversy between the parties raises a question of local law which is in no wise dependent for its decision upon the construction of any federal statute. But if this primary question is decided in the affirmative, as the plaintiff contends that it ought to be, such decision is not decisive of the plaintiff's right to recover. It is merely one step in the direction of a recovery, and, for that reason, it cannot be said that the plaintiff's cause of action is founded solely on a state law, and that it grows out of the act of March 1, 1877. To entitle the plaintiff to a decree, it must further show that the deeds executed by the governor covering lands

north of Watab were invalid; that the title of the state to said lands was not divested by the execution of said deeds, and that on March 1, 1877, the legislature of the state still had power to convey said lands by legislative enactment to such company as might elect to construct the uncompleted line from Watab to Brainerd. It is apparent, we think, that the plaintiff endeavors to establish the foregoing proposition that the deeds were in fact void, and that the lands in controversy remained subject to the disposal of the state of Minnesota, because of the invalidity of the prior conveyances, on two grounds. In the first place, it insists that the Litchfield agreement of date February 6, 1864, which was subsequently approved and confirmed by the state, operated as a division of the land grant pertaining to the branch line, so that neither Litchfield nor his successor in interest, the First Division Company, could thereafter acquire any right or title whatsoever to any lands pertaining to said grant lying north of Watab, whether they were located within the place or indemnity limits. This, without doubt, is the ground on which the plaintiff chiefly relies for the purpose of establishing the proposition that the governor acted wholly without authority in executing deeds in favor of the First Division Company for the lands now in controversy. But, in addition to such contention, plaintiff also insists, and the allegations of the bill seem to be sufficiently full and specific to furnish a foundation for such contention, that the deeds in question were also unauthorized and void by virtue of limitations and conditions found in the several acts of congress by which the lands in controversy were granted to the territory and state of Minnesota, in trust, to aid in the construction of a branch line of road from St. Anthony, via Anoka, St. Cloud, and Crow Wing, to St. Vincent. In support of this position, it is contended, in substance, that the state held the legal title to all the lands embraced in the grant in trust, and that it could only convey the same on the conditions prescribed in the several acts of congress which created the trust; that, upon a true construction of the grant, the state had no power to convey lands lying within place limits, in advance of construction, after the first 120 sections had been sold; that it had no power to convey lands to any railway company unless the tracts so conveyed were "included within a continuous length of twenty miles of road"; that the granting act of March 3, 1857, set apart and appropriated to the construction of each consecutive section of 20 miles of road the place lands lying abreast of or coterminous with each section, and that the granting act of March 3, 1865, in like manner set apart and appropriated to the construction of each consecutive section of 10 miles of road enough place and indemnity lands coterminous therewith to make altogether 100 sections of land for each 10 miles of road. It is insisted that the deeds now in controversy are invalid, without reference to state legislation, because they were executed by the governor of the state in violation of each of the foregoing provisions claimed to have been contained in said acts of congress.

The ground first stated, on which the plaintiff company bases its claim that the deeds executed by the governor were invalid, does

not involve the consideration or decision of any federal question. In construing the Litchfield agreement, and in determining what lands the St. Paul & Pacific Railroad Company intended by that contract to transfer to Litchfield and his associates, it might be found expedient, or even necessary, to consult the act of congress of March 3. 1857, which is referred to therein, and with reference to which the contract appears to have been executed. But, after all, the point at issue upon this branch of the case is the true construction of that agreement, and that is clearly a question of general and local law, inasmuch as the right asserted by the plaintiff depends upon that agreement, and the local statute by which it was adopted and confirmed. A case does not become one of federal cognizance because it may be found necessary, in construing a private contract or a local law from which the rights of the respective parties are derived, to consult some federal statute with a view of ascertaining the meaning of the contract or the scope and effect of the local law. In such cases the cause of action or the defense, as the case may be, is not founded on a law of the United States in any such sense as to bring the suit within the jurisdiction of the federal courts. Miller's Ex'rs v. Swann, 150 U. S. 132, 14 Sup. Ct. 52. It is equally clear, however, that in so far as the plaintiff company challenges the validity of the deeds on the second ground above stated, because they were executed in violation of the provisions of the several granting acts heretofore mentioned, the case at bar does involve certain federal questions which it might be found necessary to decide, and on the decision of which the right of the plaintiff to recover would depend. If the plaintiff company fails to maintain its position that the Litchfield agreement, as confirmed by state legislation, operated to divide the grant and to withdraw the lands north of Watab from the reach of the First Division Company, or that the deeds in question were executed in violation of other state laws, then it seems obvious that the court would find itself compelled to consider the federal questions above suggested,—whether the deeds were rightfully executed under federal laws, and operated to divest the state of its title to all or any of the lands therein described which lie north of Watab. It is proper to observe in this connection that we are not concerned at present with the merits of the several propositions heretofore stated on which the plaintiff bases its claim that the deeds executed by the governor were void, and conveyed no title to the lands situated north of Watab. Whether the construction that is placed on the granting acts by the plaintiff company with a view of impeaching the conveyances is sound or unsound, we need not stop at this point to inquire, because the jurisdiction of the circuit court does not depend on that inquiry. If it appears, in any aspect which the case may assume, that the right of recovery may depend upon a construction of those acts, and if the right to recover so far as it turns on the construction of federal statutes is not merely a colorable claim, but rests upon a reasonable foundation, then a federal question is involved which is adequate to confer jurisdiction. We entertain no doubt that certain provisions contained in the several acts of congress relative to the disposal of the lands by the

state and territory of Minnesota are of such a nature as to afford a reasonable ground for the contention that the lands in controversy were not conveyed by the governor of the state in conformity therewith, and that the deeds were for that reason voidable, if not void. We think that the plaintiff company may fairly invoke a construction of those statutes, and that the allegations of the bill are sufficient for that purpose. Nor is it at all material, so far as the question of jurisdiction is concerned, that the court may not be compelled to construe the acts of congress in the respects stated, or in any other, for, as we have already shown, its jurisdiction does not depend upon the nature of the question that is ultimately decisive of the plaintiff's right to recover. If a case is commenced originally in the circuit court, and, by a fair construction of the complaint, it appears that the plaintiff predicates his right to relief on the meaning or effect of a law of the United States, and the claim is made in good faith, so that there is a real instead of a merely colorable controversy, then jurisdiction over the case exists, even though it may appear that the right to the same relief is asserted on another ground, that does not involve the consideration of a federal question. In concluding the discussion on this branch of the case, it is proper to add that we do not concur in the view that the case is one of federal cognizance merely because the title to the lands in controversy is derived from the United States. The bill shows very conclusively that both parties claim under the state of Minnesota, that the title to the state is not challenged, but is conceded to be well founded under the granting acts. The questions at issue all grow out of the manner in which the state dealt with the lands after it acquired the same from the general government. Nor is the case one in which the parties are asserting rights derived respectively from conflicting land grants. Under these circumstances it must be conceded, we think, in accordance with the decision in Romie v. Casanova, 91 U. S. 379, that a federal question is not involved in the case merely because the United States is the ultimate source of title. The jurisdiction of the court must be upheld, however, on the ground heretofore stated.

The next question in order is whether the legislature of the state of Minnesota intended to declare by the act of March 1, 1877, that the particular lands in dispute were thereby forfeited to the state and conferred on such company as might thereafter complete the line from Watab to Brainerd, notwithstanding the previous conveyance thereof by the governor to the First Division Company. The decision of this question turns wholly upon the intention of the legislature, to be ascertained by all of the surrounding facts and circumstances, and the maxim must be applied that, no matter how general may be the language of a statute, that which was not within the intention of the lawmaker is not within the law. It is a notable fact, in its bearing upon the question now under consideration, that two of the deeds, the validity of which is denied, were executed and filed for record in the proper registry office of the state of Minnesota more than 10 years prior to the act of March 1, 1877, and that the other deed was executed and filed nearly 6 years prior thereto, to

wit, on July 26, 1871. In the meantime, that is to say from August, 1866, to March, 1877, the grantee in said deeds, the First Division Company, had sold and conveyed over 25,000 acres of the lands thus deeded to it, which were situated north of Watab, to various purchasers, who had settled upon some of the lands, and had very likely made valuable improvements thereon. It is not shown by the record that any one had ever questioned the validity of said conveyances prior to March 1, 1877, although, according to the present contention of the plaintiff company, the equitable title to much of the land embraced in the deeds, during all of said period, was vested in the St. Paul & Pacific Railroad Company, which was then a going concern, and most likely active in the defense of its interests. The plaintiff company likewise failed to challenge the several deeds for eight years after it had taken advantage of the provisions of the act of March 1, 1877, and had completed the line of road from Watab to Brainerd, and had thereby become entitled, according to its present contention, to demand a conveyance from the state of the lands now in dispute. Moreover, it suffered a period of five years more to elapse before it took the position which it now seeks to maintain, that the deeds in question were absolutely void when executed, and did not even operate to divest the state of the legal title. In view of these facts, it admits of no doubt, we think, that when the act of March 1, 1877, was adopted, the opinion prevailed generally among all persons who were aware of the existence of the deeds that they had been executed in substantial conformity with existing laws, and were valid conveyances. This belief that the deeds operated to convey a good title was probably strengthened by the fact disclosed by the testimony that, in executing the same, the governor of the state had acted under and pursuant to the advice of the attorney general.

It has been suggested that when the act of March 1, 1877, was adopted, the legislature was ignorant of the fact that any lands north of Watab had been conveyed to the First Division Company. This suggestion, even if it was well founded, would not determine the intention of the legislature with respect to the lands in controversy, neither would it be decisive of the construction which the act of March 1, 1877, ought to receive. The act shows very clearly that the legislature intended, by the sale of a part of the forfeited lands, to secure the payment of all claims that existed against the St. Paul & Pacific Railroad Company growing out of work theretofore done or materials furnished by individuals towards the construction of the line north of Watab, and that it also intended to protect all persons who had made settlements upon, or filed claims against, any of the lands lying within the limits of the grant between Watab and Brainerd. The tenth section of the act, as will be seen, excluded from the grant made by the state to such company as might complete the line from Watab to Brainerd all lands that had been settled upon in good faith, or against which valid homestead or pre-emption claims had been filed on or before the passage of the act. It is not too much to say that the act bears the strongest internal evidence of an in-

tention on the part of the legislature not to disturb existing rights or titles of any sort, but to protect settlers and all other persons who had colorable claims to the land, or any part of it. The general purpose seems to have been to vest in such company as might complete the line from Watab to Brainerd the right, on completion, to demand conveyances from the state of such lands within the limits of the grant as were clearly subject to its disposal because of the existence of no outstanding claims. We can scarcely conceive it to be possible that the legislature would have been any less solicitous to protect individuals who had purchased land from the First Division Company in reliance on the title conveyed by the deeds executed by the governor, than it was to protect persons who had made settlements on the land, possibly after the definite location of the line and after the withdrawal of the lands from sale. On the assumption, therefore, that the legislature was ignorant of the existence of the deeds, yet without a more definite expression of such a purpose, the act ought not to receive a construction that will bring within its purview lands that had already been conveyed by the governor to the First Division Company, in the belief that it had earned the same and was justly entitled thereto. We are persuaded, however, that it is not probable that the legislature passed the act of March 1, 1877, in ignorance of the fact that the deeds in question had been executed. The long period that had then elapsed since they were executed, the publicity that had been given to the same by filing them in the proper office and by certifying lists of the tracts of land thereby conveyed to the several counties where they were situated, the quantity of land that had actually been sold, and the discussions and investigations which usually precede the passage of such legislative enactments as the act of March 1, 1877, render it highly improbable, we think, that the legislature could have been ignorant that such conveyances had been executed and delivered, and that a portion of the land had been sold. It is most reasonable to presume that the legislature was well acquainted with the fact that certain lands north of Watab had been conveyed to the First Division Company, and that it shared in the common belief then entertained by all persons who were aware of the existence of the deeds, that they had been executed in accordance with law, and that the lands thereby conveyed would not be affected by the provisions of the act, because they were no longer subject to legislative control. From the standpoint occupied by the legislature, believing as it did, no doubt, that the previous conveyances were valid, it was both a reasonable and natural view that the language of the act granting the "lands * * * appertaining to the portion of the road it shall complete * * * formerly held by * * * the St. Paul and Pacific Railroad Company" could only be held applicable to lands then subject to its disposal, that is to say, to lands not theretofore earned or conveyed. Moreover, the execution of the deeds by the governor was an act done by him in an official capacity, and future legislatures, as well as his successors in office, were bound to take notice of what had already been done by the

executive department of the government in discharge of duties devolved upon it by law.

There is another consideration to be briefly noticed which strongly supports the foregoing conclusions. The legal title to all the lands in controversy, at the date of their conveyance by the governor, was undoubtedly vested in the state of Minnesota. The state had been authorized by the general government to dispose of the lands in aid of the construction of a certain line of railroad. It was obviously contemplated by congress that the state would pass laws. designating a beneficiary of the grant, and prescribing the manner in which the lands should either be sold by the state, or the title thereof be transferred to such company or companies as might be formed to construct the proposed road. Such laws were, in fact, passed both by the territory and the state, and the local legislation on that subject, as might have been anticipated, became elaborate and complex. The execution of these laws was committed to the governor of the state. He was empowered to execute deeds, from time to time as the work of construction progressed, for all of the lands lying within the limits of the grant, and in the discharge of that duty it became necessary for the governor to consider and decide whether the conditions had been fulfilled which entitled the beneficiary company or companies to demand conveyances from the state. After the St. Paul & Pacific Railroad Company had become segregated into two corporations by the Litchfield agreement, and by the act of the legislature approving and confirming the agreement, it undoubtedly became the duty of the governor to decide, in the first instance, how much of the granted lands passed by that agreement to the First Division Company, and whether it could lawfully lay claim to any lands, either within the place or indemnity limits, that were situated north of Watab, and, if so, to what extent it could rightfully lay claim thereto. The record discloses that some of these questions which were thus committed to the decision of the governor, in the course of time, and particularly in view of the Litchfield agreement, became complex and difficult of solution. Inasmuch, then, as the legal title to the lands in controversy was vested in the state, and the governor had been given power to execute conveyances therefor, and to determine, as between different companies, which was entitled to them, and whether the conditions warranting a conveyance of the same had been fulfilled, the conclusion follows that the deeds in controversy were not void, but at most were only voidable. According to well-established principles, an erroneous decision by the chief magistrate of a question intrusted to him to decide cannot be said to have had the effect of rendering a deed executed by him in conformity with such decision absolutely null and void. The numberless titles in the state of Minnesota, and perhaps in other states as well, which rest upon deeds executed by its chief executive officer under similar circumstances, and the very common practice of relying implicitly upon titles emanating from the state, admonish us to be cautious in sanctioning the doctrine that a mistake made in

the construction of a law is sufficient to render a deed utterly void, although the power to convey the particular tract of land to some one is undoubtedly vested in the officer. In the case of U. S. v. Winona & St. P. R. Co., 67 Fed. 948, which has been under advisement, and has been considered by this court in connection with the case at bar, we have stated succinctly under what circumstances a patent for lands will be esteemed void, and when it will be held to be merely voidable. It is sufficient to say at present that, within the rules announced in that case, if the governor of the state of Minnesota acted under a mistaken view of the law in executing the several deeds now in question to the First Division Company, such conveyances were at most only voidable, and so the circuit court appears to have held.

It results from this view—that if the deeds are invalid they are at most only voidable—that we should be forced to conclude that the act of March 1, 1877, was not intended to declare a forfeiture of the lands theretofore conveyed by the governor, even if we believed it to be probable that the legislature acted under the impression that those conveyances had been erroneously executed. We would not feel authorized to infer merely from the general language of the statute, and in the absence of any allusion to said deeds or to titles acquired thereunder, that the legislature intended to declare, without judicial proceedings of any sort, that the lands theretofore conveyed by the governor were thereby forfeited to the state and granted to another company. The question now under discussion being merely as to the intent of the legislature, it is not necessary to decide whether it was competent for the state, by legislative enactment, to forfeit lands which had been erroneously conveyed by the governor, and were held by the grantee under a voidable deed, or whether the exercise of that power pertains solely to the judiciary, as was held in Fletcher v. Peck, 6 Cranch, 87. For present purposes, it will suffice to say that it ought not to be presumed that the legislature intended to exercise the authority in question without unmistakable evidence of such a purpose, and that we find nothing in the act of March 1, 1877, or in the circumstances which induced the passage of that measure, which satisfies us that such was the legislative intent. It follows, from the construction which we have felt compelled to place on the act of March 1, 1877, that the plaintiff company did not, by the provisions of that act, acquire any such title to or interest in the lands in controversy as will enable it to maintain the suit at bar.

The decree of the circuit court is accordingly reversed, and the cause is remanded to that court, with directions to dismiss the bill of complaint at the complainant's cost.