**McFADDIN EXPRESS, INCORPORATED, L & L Leasing Corporation, and Louis DeBeradinis, Jr.**

**v.**

**The ADLEY CORPORATION, Michael L. Adley, Donald A. Adley, Ralph J. Adley, Daniel J. Adley, and United States of America.**

**Civ. 10763.**

United States District Court
D. Connecticut.

Jan. 7, 1965.

Tobias Weiss, Stamford, Conn., for plaintiff.

Joseph P. Cooney, Cooney & Scully, Hartford, Conn., William C. Baskin, Jr., Wiggin & Dana, Jon O. Newman, U. S. Atty., Howard T. Owens, Jr., Asst. U. S. Atty., New Haven, Conn., for defendants.

BLUMENFELD, District Judge.

This is an action for an accounting and damages allegedly caused by the defendants' mismanagement of the business, property and affairs of the plaintiff corporations by the defendants from April 20, 1959, and thereafter.

Plaintiff, McFaddin Express, Incorporated, (hereinafter McFaddin) was a motor carrier of freight, authorized by the ICC to engage in that business over certain routes between points in Connecticut and New York City, eight New Jersey counties and over certain New England routes. Plaintiff, Louis DeBeradinis, Jr., was the sole shareholder of McFaddin and of L & L Leasing Corporation (hereinafter L & L). About ⅕th of McFaddin's rolling stock was leased from L & L.

Defendant, Adley Corporation (hereinafter Adley), is also a motor carrier of freight authorized by the ICC. It operates over a larger network of routes which includes the area of McFaddin's operations. The plaintiff corporations had been in financial straits for a considerable time before 1959.

A "contract of sale" for the sale of all of the stock in McFaddin and L & L to Adley was executed as of April 20, 1959. The parties agreed that the liabilities of the corporations equalled the value of the tangible assets and that $125,000 was the value of the intangible assets, subject to reduction in the event that an annexed consolidated balance sheet turned out to be inaccurate. Contemporaneously the parties also entered into a "management contract" under which complete control was to be immediately relinquished to Adley, who thereupon undertook to carry on both businesses.

The contract to buy the stock was expressly conditioned upon approval by the ICC, whose consent to a merger is required. See 49 U.S.C. § 5. An application for such approval was filed on May 7, 1959. To effectuate the objective of the separate management contract, an application under the Interstate Commerce Act § 210a(b) (49 U.S.C. § 310a (b)) for approval of temporary authority for Adley to operate McFaddin was filed on May 1st. This was treated by the ICC as concurrently filed with the application for authority to merge under § 5 of the act and was immediately granted.

Shortly thereafter, the assessment of tax delinquencies and penalties, followed by collection procedures of the Internal Revenue Service imposed so much additional stress upon the already strained financial condition of McFaddin that it could not survive. Both corporations were dissolved by forfeiture on November 30, 1962, for failure to file statutory reports in accordance with Connecticut's law. Adley refused to comply with its agreement to purchase the stock from DeBeradinis. This lawsuit followed.

The action was begun by a writ of summons and a writ of attachment which were issued as a matter of course upon application to the clerk. In addition to the garnishment of several bank accounts, most of Adley's rolling stock then engaged in transportation of freight was attached. Before the marshal's return was filed, the parties allegedly reached a settlement. The attachments on the trucks were released. The plaintiffs allegedly then asserted additional settlement demands and threatened to re-attach the defendant's trucks. This precipated an ex parte application on December 17, 1964, for a temporary injunction against further attachment of the defendant's property. Upon the defendant's offer to furnish a bond in lieu of attachment for an amount in excess of the amount of the settlement allegedly agreed upon, a temporary restraining order was issued pending a hearing on the application. See Landis v. North American Co., 299 U.S. 248, 254–255, 57 S.Ct. 163, 81 L.Ed. 153 (1936). At the hearing on December 22, 1964, on the issues thus presented, the defendants raised for the first time the threshold question of this court's jurisdiction over the subject matter of the plaintiffs' claim and, therefore, of the court's power to issue a writ of attachment.

JURISDICTION

■ It is conceded that diversity jurisdiction does not exist. All parties are citizens of Connecticut. The other major category of cases which the federal courts have authority to hear are cases arising under the Constitution, laws and treaties of the United States; these are called "Federal Questions." In any event, the jurisdiction of federal courts lies within the power of Congress to regulate. If Congress has given this court power to entertain jurisdiction, it may do so, but not otherwise. Turner v. Bank of North America, 4 U.S. (4 Dall.), 8, 10, n. 1, 1 L.Ed. 718 (1799). With specific reference to inferior federal courts, Justice Grier said flatly: "Courts created by statute can have no jurisdiction but such as the statute confers." Sheldon v. Sill, 49 U.S. (8 How.) 441, 449, 12 L.Ed. 1147 (1850). Therefore, unless a statutory basis for jurisdiction exists, persons do not have any right to proceed, or be proceeded against, in the first instance in a federal rather than a state court.

This court's jurisdiction over the subject matter of this case is asserted on the following statutory jurisdictional grounds:

1. 28 U.S.C. § 1331—

"(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States."

2. 28 U.S.C. § 1337—

"The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."

3. 28 U.S.C. § 1336—

"(a) Except as otherwise provided by Act of Congress, the district courts shall have jurisdiction of any civil action to enforce, enjoin, set aside, annul or suspend, in whole or in part, any order of the Interstate Commerce Commission."

I.

■ For federal question jurisdiction to exist, a controverted question of federal law must form a substantial part of the plaintiff's case, e. g., Gully v. First Nat'l Bank, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936). Cf. Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950). The remedies which the plaintiffs seek are founded on alleged breaches of contracts. In all of its essential features the case made by the plaintiffs' complaint is based upon contracts negotiated at arms length in the open market, and they owed nothing to federal legislation. Every question which is raised depends for decision upon conventional local or general common law concepts and doctrines of damages applicable in suits to enforce purely private rights. In construing the contracts, it might be found expedient or even necessary to refer to or consult the statutes upon which the applications to the ICC for permission to merge and to temporarily operate McFaddin were based, which are referred to in the complaint, and with some reference to which the contracts appear to have been executed. But, as stated in St. Paul, M. & M. Ry. v. St. Paul & No. Pac. R. R., 68 Fed. 2, 13 (8th Cir. 1895), aff'd by consent, 18 S.Ct. 946, 42 L.Ed. 1212 (1897), where a similar issue of federal question jurisdiction was decided adversely to the plaintiff—

"[A]fter all, the point at issue upon this branch of the case is the true construction of that agreement, and that is clearly a question of general and local law, inasmuch as the right asserted by the plaintiff depends upon that agreement, and the local statute by which it was adopted and confirmed. A case does not become one of federal cognizance because it may be found necessary, in constru-

ing a private contract or a local law from which the rights of the respective parties are derived, to consult some federal statute with a view of ascertaining the meaning of the contract or the scope and effect of the local law. In such cases the cause of action or the defense, as the case may be, is not founded on a law of the United States in any such sense as to bring the suit within the jurisdiction of the federal courts."

## II.

██ No citation of examples of the wide scope of congressional legislation under the Commerce Clause, nor of the willingness of the Supreme Court to uphold it, is pertinent, for the jurisdiction of this court is not co-extensive with the power of Congress. For a matter in controversy to "arise[s] under laws of Congress regulating commerce" so as to enable this court to exercise jurisdiction over it, there must, at the very least, first be such "laws."

Among the 133 separate paragraphs in the plaintiffs' 33 page complaint, it is not possible to find one which advises the parties defendant what is "the law that *creates* the cause of action" (Emphasis added), see American Well Works Co. v. Layne & Bowler Co., 241 U.S. 257, 260, 36 S.Ct. 585, 60 L.Ed. 987 (1916), nor has it been made to appear in any way what law regulating commerce might require judicial construction. Cf. T. B. Harms Co. v. Eliscu, 339 F.2d 823 (2d Cir. 1964); DeSylva v. Ballentine, 351 U.S. 570, 76 S.Ct. 974, 100 L.Ed. 1415 (1956).

## III.

The main thrust of plaintiffs' argument boils down to a contention that the contracts between the parties became in effect a provision in the order of the ICC permitting Adley to temporarily operate McFaddin. The only effect, if any, which the management contract (attached to the application for such authority) may have had was to corroborate the applicants' representations as to the complete-

ness of the control being conferred upon Adley by McFaddin.

██ The legal requirements for ICC approval are grounded in the purposes underlying the whole statutory scheme for regulation of interstate motor freight transportation. In general, these are not merely the regulation of relations of carrier and shipper *inter se,* but are also to secure the general public interest in adequate non-discriminatory transportation at reasonable rates. Midstate Horticultural Co. v. Pennsylvania R. R. 320 U.S. 356, 64 S.Ct. 128, 88 L.Ed. 96 (1943). That the concern of the ICC with any possible effect of the contracts other than as a basis for temporary permission for Adley to operate McFaddin was completely divorced from any concern which the parties to the contracts might have *inter sese* could not be more pointedly exemplified than by the considered action of the Commission when the plaintiffs attempted to assert before it, as they now seek to assert here, their claims that Adley had abused its control and management of McFaddin to the damage of McFaddin and to the profit of Adley. In expressly rejecting consideration of those claims, it said in its final opinion, File No. MC–F–7192 (opinion Oct. 22, 1963):

"In connection with the fact that Adley, on the one hand, and McFaddin, on the other, are not in agreement as to whether the former provided bona fide management under temporary authority or whether the former absorbed the traffic of the latter, and to what extent, if any, the latter misrepresented its financial position to the former, it is pertinent to point out that these are not matters requiring resolution by us, and that, even assuming that these issues could be resolved one way or the other, the conclusions reached would have no bearing on our final action herein. This long-standing controversy is, as was stated in the prior report, a matter for the courts to decide if the parties cannot other-

wise resolve the controverted matters."

■ The existence of a binding agreement from McFaddin giving Adley control over its business operations may have helped to persuade the ICC to grant Adley temporary authority to operate McFaddin. However, under that order granting such temporary authority, the ICC's function was only to enforce compliance with ICC rules and regulations, not to enforce either the contract of Adley to purchase DeBeradinis' shares of stock in McFaddin or its contract to manage all of that corporation's business. These were contract obligations. No violation of any ICC rule or regulation is alleged.

■ Contentions that jurisdiction would lie in the federal district court to consider claims such as are presented in this complaint were rejected in Chicago & N. W. Ry. v. Toledo, P. & W. R. R., 217 F.Supp. 64 (S.D.Ill.N.D.), aff'd., 324 F.2d 936, 939 (1963), where the district court said at p. 69 of 217 F. Supp.:

"The fact of approval of the agreement by the Interstate Commerce Commission has no significant bearing upon the jurisdictional question. No mandatory order of the I.C.C. is involved. Although the Sommer connection and the joint-trackage arrangement could not legally be undertaken without I.C.C. approval, 49 U.S.C.A. § 5(2) (a) (ii), its approval was permissive only. The project might have been abandoned by the parties and the agreement never made without penalty. The fact that the Sommer connection was constructed and the agreement made may well create additional rights in the shipping public, but it does not have the effect of incorporating the contract into the Commerce Act insofar as the respective rights of plaintiff and T. P. & W. are concerned." (n. 4 omitted)

On affirmance, the Court of Appeals stated in 324 F.2d at p. 938:

"North Western argues that the joint trackage agreement could not have been undertaken without the approval of the Interstate Commerce Commission; that approval of the ICC gave the agreement its vitality; that it follows plaintiff's claim relates to rights and obligations arising under the Interstate Commerce Act.

"We hold that although it was necessary to obtain Interstate Commerce Commission approval of the 1957 agreement, this is not sufficient to confer jurisdiction upon the District Court. No mandatory order of the Interstate Commerce Commission is involved. We agree with the District Court that the Interstate Commerce Commission approval was permissive only. The fact that such permission was required, does not have the effect of making the commerce act a part of the contract insofar as the respective rights of North Western and TP&W are concerned.

\*    \*    \*    \*    \*    \*

"In determining the rights of the parties to this suit, it is not necessary to consider any part of the Interstate Commerce Act or any other federal statute, nor the Constitution of the United States. The Court which will pass on this question needs only to consider the two instruments that constitute the 1957 agreement."

The plaintiffs' contention that they are seeking to "enforce an order of the ICC" and that jurisdiction therefor lies under 28 U.S.C. § 1336 is rejected.

### IV.

■ There remains one final question. The plaintiffs argue that where a statutory claim and common law claim grow out of the same transaction, the doctrine of pendant jurisdiction enunciated in Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933), is applicable to support federal court jurisdiction. But having determined on this motion that the complaint does not come

close enough to stating a federal claim and that nothing in the facts brought to the attention of the court in the thorough brief and argument presented by plaintiff's counsel overcomes this deficiency, there is nothing upon which to append the common law claim. T. B. Harms Co. v. Eliscu, supra. See Hart & Wechsler, The Federal Courts and the Federal System, at 808 (1953). The alleged "federal" claims are "wholly insubstantial and frivolous." See Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1945).

### V.

At the hearing on this motion, the plaintiffs filed an amendment adding the United States of America as a party in order to comply with procedural requirements in actions to enforce an order of the ICC under 28 U.S.C. § 2321. That neither created diversity of citizenship nor imported any federal question.

The plaintiffs may not have their day in this court. This court does not pass upon the merits of the plaintiffs' claims stated in the complaint.

The complaint is accordingly dismissed for lack of jurisdiction without prejudice to plaintiffs' rights to bring such action as they may be advised in the appropriate forum.